UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JUDITH FERRENBACH, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>UBER TECHNOLOGIES, INC.,<br><br>Defendant. | Docket No. 15-cv-06818 (CBA)(SMG)<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Judith Ferrenbach, individually and on behalf of all others similarly situated, by her attorneys Simmons Hanly Conroy and Martin Fleisher, J.D. P.C., as and for her Complaint against Uber Technologies, Inc., alleges on personal knowledge as to herself and on information and belief as to all other matters as follows:

## NATURE OF THE ACTION

1. This is a class action to recover damages for the willful violation by Defendant Uber Technologies, Inc. ("Uber") of: (a) the federal Telephone Consumer Protection Act (the "TCPA"), 47 U.S.C. § 227, *et seq.*; and (b) New York's anti-robocalling statute, General Business Law § 399-p. Both statutes place restrictions on the use of automatically-dialed telephone calls ("Robo-Calls"), in order to protect recipients from harassment and unwanted telephone charges. Both statutes impose fines for violations of their restrictions on Robo-Calls.

2. During July 2015, Uber placed hundreds of thousands of pre-recorded Robo-Calls to the home and mobile telephone numbers of New York City residents. These calls consisted of recorded messages advertising the benefits and advantages of Uber's services and urging call recipients to oppose an initiative by Mayor Bill de Blasio and the City Council to limit Uber's growth within New York City.

3. Uber did not obtain prior express consent of those it called. Nor did it comply with the restrictions on such calls set forth in the TCPA and in GBL § 399-p.

4. As set forth in detail below, in executing its massive Robo-Calling

1

campaign, Uber willfully violated the express provisions of both the TCPA and GBL § 399-p. Uber's disregard for the statute was more than incidental or neglectful: at all relevant times Uber personnel – including members of its extensive internal legal department – had actual knowledge of both the existence, and the specific relevant terms of both the TCPA and the GBL. In fact, on at least two other occasions, Uber has been sued by putative classes for indiscriminate mass communication campaigns, in violation of the TCPA and state statutes regulating similar issues.

5. As described below, Plaintiff received several Robo-Calls from Uber that did not comply with the TCPA or with GBL § 399-p. Plaintiff brings this action on her own behalf and on behalf of all others similarly situated to recover the statutory damages authorized for these violations.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2)(A) because the case is brought as a class action, the named Plaintiff is a citizen of a State different from any State of which the defendant is a citizen, and the matter in controversy exceeds the sum or value of $5 million. This action is not subject to any of the mandatory or discretionary exceptions to CAFA jurisdiction set forth in § 1332(d). This Court also has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367, in that Plaintiff's claim under the TCPA arises under the laws of the United States, and the Court has supplemental jurisdiction over Plaintiff's state-law claim.

7. Venue is proper in this District because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## PARTIES

8. Plaintiff Judith Ferrenbach is, and at all relevant times was, a citizen of New York, residing in Kings County within the City of New York. (Ferrenbach is also sometimes known as Judith F. Bradshaw.) In or around the summer of 2015, Ferrenbach received multiple Robo-Calls from Uber on her landline telephone.

9. Uber Technologies, Inc. is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business at 1455 Market Street, 4th Floor, San Francisco, California 94103.

## STATUTORY FRAMEWORK

10. Under the TCPA, it is unlawful to "make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice. . . .(iii) to any telephone number assigned to. . . a cellular telephone service." 47 U.S.C. § 227(b)(1)(A). It is also unlawful to "initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party," unless certain exceptions apply. 47 U.S.C. § 227(b)(1)(B).

11. Section 227(b)(3) of the TCPA provides that recipients of calls placed in violation of § 227(b)(1)(B) are authorized to bring an action to recover, for each violation, the greater of the monetary loss caused by the violation or $500. If the court finds that the caller willfully or knowingly placed calls in violation of § 227(b), the statute authorizes the court to impose a penalty of up to $1,000 per violation.

12. GBL § 399-p of the GBL regulates two distinct kinds of phone calls: (a) calls placed using an "automatic dialing-announcing device," i.e., irrespective of the content of such calls; and (b) "consumer telephone calls."

13. Paragraph 399-p(1)(a) defines the term "automatic dialing-announcing device" as "any automatic equipment which incorporates a storage capability of phone numbers to be called and is used, working alone or in conjunction with other equipment, to disseminate a pre-recorded message to the telephone number called without the use of an operator."

14. GBL § 399-p(2) provides: "No person shall operate an automatic dialing-announcing device nor place any consumer telephone call except in accordance with the

provisions of this section."

15. GBL § 399-p(3) provides: "Whenever telephone calls are placed through the use of an automatic dialing-announcing device, such device shall do all of the following: … (a) state at the beginning of the call the nature of the call and the name of the person on whose behalf the call is being transmitted and at the end of such message the address and telephone number of the person on whose behalf the message is transmitted …."

16. GBL § 399-p also contains a remedy for violations of its provisions. The statute provides that "any person who has received a telephone call in violation of subdivision three, four or five of this section may bring … an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the actual damages to an amount not to exceed three times the actual damages, not to exceed one thousand dollars, if the court finds that the defendant knowingly or willfully violated such subdivisions." Section 399-p(9) also authorizes the Court to award attorneys' fees to a "prevailing plaintiff."

## FACTS COMMON TO ALL CLAIMS

17. Uber provides a "ridesharing" software application (the "App) that allows customers in need of transportation to use their smartphones to request a ride from Uber drivers (whom Uber refers to as independent, third-party contractors).

18. Uber takes for itself 35% of every fare initiated in New York City and the surrounding suburbs.

19. As of July 8, 2015, according to New York City's Mayor Bill de Blasio and the New York City Council, New York City's streets were clogged with approximately 63,000 "For Hire Vehicles" (FHVs) (vehicles other than medallion-bearing yellow cabs that provide ride services for hire), 19,000 of which were Uber cars. To alleviate traffic congestion in the City, Mayor de Blasio and the City Council proposed an initiative to cap the growth of all FHVs at 1% annually. The cap on FHVs would apply to Uber cars.

20. At the time, Uber was reporting growth in the number of New York City

drivers of 3% monthly, i.e., 36% annually. Under the proposed 1% cap, Uber would have been allowed to add approximately 200 cars in New York City in the year following the passage of the measure. Uber's plan was to add more than 7,200 cars during the same time period – and to take 35% of every fare from each new car.

21. In other words, the economic impact to Uber from the passage of Mayor de Blasio's and the City Council's proposed cap initiative would have been in the hundreds of millions of dollars during the first year alone, and ultimately well into the billions.

22. To defeat the proposed initiative, Uber embarked on a massive campaign across multiple media platforms. Uber's crusade included taking out daily ads in New York's major newspapers and placing enormous billboard ads on the sides and backs of New York City buses and bus stops.

23. The campaign also included hundreds of thousands of Robo-Calls to Uber subscribers in or around July 2015. These calls advertised the benefits of Uber's services, especially to riders outside Manhattan, and urged recipients to call their City Council members and ask them to vote against the Mayor's initiative. Some or all of the calls were specifically targeted at recipients outside Manhattan, including recipients in Brooklyn, Queens, and Staten Island.

24. Each of the Robo-Calls Uber made to New Yorkers in or around July 2015 was placed using an automatic dialing-announcing device and/or an automatic telephone dialing system. Calls were placed to phone numbers Uber had on file because its App required use of a smartphone to contact drivers. These included numbers assigned to cellular telephone services, as well as residential numbers.

25. Uber did not obtain express prior consent, orally or in writing, for any of the Robo-Calls it placed to New Yorkers in or around July 2015.

26. Each of the Robo-Calls that Uber placed to New Yorkers in or around July 2015 included advertising, in that each call touted Uber's convenience and benefits in specific contrast to medallion-bearing yellow taxis.

27. Each of the Robo-Calls that Uber placed to New Yorkers in or around July 2015 was made for a commercial purpose, in that each call promoted Uber's ride service as compared to medallion-bearing yellow taxis, and each call was made for the purpose of preventing the adoption of restrictions on Uber's business in New York City.

28. None of the Robo-Calls that Uber placed to New Yorkers in or around July 2015 pertained in any way to any election, or to any candidate or issue on which the recipient of the call would be entitled to vote.

29. Uber used at least two scripts for the Robo-Calls it placed to New Yorkers in or around July 2015. "Script A," which appears to have been designed for recipients whose City Council representatives were sponsors of the bill in question, was as follows:

> Hi. It's Molly with Uber, and we need your help. Uber ended the days when you couldn't get a ride home because cabs didn't want to leave Manhattan. Now Mayor de Blasio is trying to bring the bad old days back because his millionaire taxi donors are telling him to. But why on earth would your Council Member ever consider voting for something like this? They should stand up for you, not take orders from the mayor. Your council member is sponsoring this bill, and we need your voice. Please call your council member and tell them to take their names off Mayor de Blasio's anti-Uber bill because you, and all New Yorkers, deserve reliable transportation. Paid for by Uber-212 257-1745.

30. "Script B," which appears to have been designed for recipients whose City Council representatives were not necessarily sponsors of the bill in question, was as follows:

> Hi. It's Derrick with Uber, and we need your help. Uber ended the days when New Yorkers had to worry about being able to find a reliable ride home; but now, Mayor de Blasio wants to cap the number of drivers that can partner with us, ending Uber as you know it, just because his millionaire taxi donors are telling him to. The *Daily News* has called de Blasio's cap on Uber quote disingenuous and a bad deal for New Yorkers. Please call your council member and tell them to oppose the anti-Uber bill, because they should look out for you, not for the mayor's rich donors. Paid for by Uber 212-257-1745.

31. These scripts were used in tens or hundreds of thousands, or more, of Robo-

6

Calls placed by Uber to New Yorkers in or around July 2015 using an automatic dialing-announcing device(s) and/or an automatic telephone dialing system.

32. None of the Robo-Calls that Uber placed to New Yorkers in or around July 2015 included Uber's address, as was required by state law. Each of the calls complied with the other highly specific requirements of GBL § 399-p, such as the requirement that the calls begin with the name of the person calling ("Molly" and "Derrick"), that the call state the entity on whose behalf the call was being placed (both "Molly" and "Derrick" indicated that they were "from Uber"), and that the call end with a telephone number ("Paid for by Uber 212 257-1745"). In other words, Uber's personnel appeared to have actual knowledge not only of the existence of legal requirements for its Robo-Calls, but of the specific requirements and obligations applicable in New York.

33. By omitting Uber's California address, Uber's calls concealed from (or failed to remind) recipients that a California-based company was attempting to interfere with the New York City Council. Inclusion of Uber's California address would have made obvious to recipients the company's outsider status, its inability to lobby the New York City Council directly, and the fact that the profits it was seeking to protect would not accrue to the benefit of a New York-based business.

34. At the time it placed its Robo-Calls to New Yorkers in or around July 2015, Uber was well aware of the need to comply with state and federal law in placing automatically-dialed calls. Uber's violations of the TCPA and of GBL § 399-p were, at a minimum, reckless, because, as alleged above, Uber has been sued at least twice in federal class actions under the TCPA. Uber's continued violations of law demonstrate the willfulness of its misconduct.

35. Plaintiff Judith Ferrenbach has never been an Uber subscriber.

36. Over the course of two days in or about the summer of 2015, Plaintiff Judith Ferrenbach received multiple automatically dialed, pre-recorded telephone calls from Uber on her landline phone urging her to contact her City Council representative on

Uber's behalf.

37. Ferrenbach had not provided express consent to receive these Robo-Calls from Uber.

38. The Robo-Calls that Ferrenbach received in or about the summer of 2015 did not provide Uber's address.

39. The Robo-Calls that Ferrenbach received delivered a message identical or similar in substance to the messages that used Script A and Script B.

40. The Robo-Calls that Ferrenbach received were made for a commercial purpose in that they contained advertising and were intended to promote Uber's services over the services of medallion-bearing yellow taxis and to prevent the adoption of restrictions on Uber's business in New York City.

## CLASS ACTION ALLEGATIONS

41. Plaintiffs bring this action on behalf of herself and all others similarly situated ("the Class") pursuant to Rule 23 of the Federal Rules of Civil Procedure. The Class is initially defined as:

> All persons in New York City who received calls placed by Uber in or around July 2015 on their residential landline and/or personal mobile phones urging them to contact their City Council representative or otherwise referencing proposals to restrict the growth in the number of for-hire vehicles in New York City.

42. Excluded from the Class are entities in which Uber has a controlling interest, the officers or directors of Uber, and their counsel. Plaintiffs reserve the right to modify the Class definition based on the results of discovery and/or rulings of the Court.

43. This action may be properly maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

44. The Class is ascertainable and is so numerous that joinder of all members is impracticable. Plaintiff does not know the exact number of class members, but believes that the proposed class includes tens, if not hundreds, of thousands of members. It is

8

possible that the identity of Class members can be determined or confirmed in the business records and other documents in the possession of the Defendant.

45. There are questions of law and fact common to the claims of all class members. These common questions predominate over any individual questions that may exist.

46. The common questions include:

   a. Whether the calls that members of the Class received were placed by an "automatic telephone dialing system," within the meaning of the federal Telephone Consumer Protection Act, or an "automatic dialing-announcing device," within the meaning of N.Y. G.B.L. § 399-p.

   b. Whether the calls that Uber placed to members of the Class used one or more pre-recorded scripts;

   c. Whether the pre-recorded scripts Uber used in placing calls to members of the Class included Uber's address in the call message;

   d. Whether Uber's calls to members of the Class were made for a commercial purpose;

   e. Whether Uber's calls to members of the Class complied with the provisions of the TCPA;

   f. Whether Uber's calls to members of the Class complied with G.B.L. § 399-p; and

   g. Whether in placing calls to members of the Class, Uber willfully or knowingly violated G.B.L. § 399-p and/ the TCPA.

47. The claims of the representative Plaintiff are typical of the claims of the members of the Class. The representative Plaintiff and the members of the Class all received Robo-Calls made by Uber that employed one or more pre-recorded scripts that did not comply with the TCPA and/or with G.B.L. § 399-p. The representative Plaintiff seeks statutory damages, which are the same damages available to all members of the

9

Class.

48. The representative Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel who are experienced and competent trial lawyers in complex and class action litigation. There are no material conflicts between the claims of the representative Plaintiffs and the members of the Class that would make class certification inappropriate. Counsel for the Class will vigorously assert the claims of all members of the Class.

49. This suit may be maintained as a class action under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to the Class predominate over the questions affecting only individual members of the Class and a class action is superior to other available means for the fair and efficient adjudication of this dispute. The statutory damages suffered by individual class members are small compared to the burden and expense of individual prosecution of this case. Even if members of the Class themselves could afford such individual litigation, the court system would be overwhelmed by the individual lawsuits. In addition, individualized litigation would increase the delay and expense to all parties and to the court system. Individualized litigation also presents a potential for inconsistent or contradictory judgments. By contrast, the class action device presents far fewer management difficulties; allows the hearing of claims which might otherwise go unaddressed because of the relative expense of bringing individual lawsuits; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## CLAIMS FOR RELIEF
### FIRST CLAIM FOR RELIEF
### Violation of TCPA, 47 U.S.C. § 227

50. Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation set forth in ¶¶ 1-49, as if fully set forth herein.

51. Each of the Robo-Calls placed to Plaintiff and to the members of the Class

in or around July 2015 was placed using an "automatic telephone dialing system" within the meaning of 47 U.S.C. § 227(a)(1).

52. Each of the Robo-Calls placed to Plaintiff and to the members of the Class in or about July 2015 was made to a telephone number assigned to a cellular telephone service or to a residential telephone landline.

53. Each of the Robo-Calls placed to Plaintiff and to the members of the Class in or about July 2015 used a prerecorded voice to deliver a message.

54. Each of the Robo-Calls placed to Plaintiff and to the members of the Class in or about July 2015 was made without the prior express consent of the called party.

55. Each of the Robo-Calls placed to Plaintiff and to the members of the Class in or about July 2015 was made for a commercial purpose, specifically for the purpose of promoting Uber's business in New York over medallion-bearing yellow taxis and for the purpose of preventing the adoption of restrictions on Uber's business in New York City.

56. Each of the Robo-Calls placed to Plaintiff and to the members of the Class in or about July 2015 was in violation of the Telephone Consumer Protection Act, 47 U.S.C.§ 227.

57. By reason of the foregoing, Uber is liable to Plaintiff and to each member of the Class for $500 for each violation, in a total amount to be determined at trial, but not less than $500,000,000.

58. In making the Robo-Calls to the Plaintiff and to the members of the Class in or about July 2015 in violation of the TCPA, Uber acted willfully and knowingly, in that Uber had been previously sued for similar violations and thus was aware of the requirements of the TCPA, but chose to ignore them. For this reason, this Court should increase the amount of the award to $1,500 per violation, in accordance with the provisions of the TCPA.

59. Plaintiff and the members of the Class are also entitled to an injunction precluding Uber from placing future calls in violation of the TCPA.

**SECOND CLAIM FOR RELIEF**
**Violation of N.Y. G.B.L. § 399-9**

60. Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation set forth in ¶¶ 1-59, as if fully set forth herein.

61. Each of the Robo-Calls placed to Plaintiff and to the members of the Class in or around July 2015 was placed using an "automatic dialing-announcing device," within the meaning of § 399-p(1)(a) of the GBL.

62. None of the Robo-Calls placed to Plaintiff and to the members of the Class in or about July 2015 stated at any point during the call the address of the person on whose behalf the message was transmitted.

63. Each of the Robo-Calls placed to Plaintiff and to the members of the Class in or about July 2015 was in violation of G.B.L. § 399-p(3)(a).

64. By reason of the foregoing, Uber is liable to Plaintiff and to each member of the Class for $50 for each violation, in a total amount to be determined at trial, but not less than $50,000,000.

65. In making the Robo-Calls to the Plaintiff and to the members of the Class in or about July 2015 in violation of GBL § 399-p, Uber acted willfully and knowingly, in that Uber had been previously sued for similar violations of state law and thus was aware of the requirements of need to comply with state law in making Robo-Calls. In addition, the pre-recorded message that Uber delivered with the Robo-Calls it made to the Plaintiff and to the members of the Class in or around July 2015 included some, but not all, of the information required by G.B.L. § 399-p, suggesting that Uber was aware not only of the need to comply with state law generally, but also of the specific requirements of G.B.L. § 399-p, but nonetheless failed to comply with all of the requirements. For this reason, this Court should increase the amount of award to $1,000 per violation, in accordance with the provisions of § 399-p(9).

66. Plaintiff and the members of the Class are also entitled to an injunction

precluding Uber from placing future calls to New Yorkers in violation of § 399-p.

WHEREFORE Plaintiff and the members of the Class pray for judgment as follows:

A. Certifying this class as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, designating Plaintiff Judith Ferrenbach as the class representative, and appointing the undersigned counsel as Class Counsel;

B. Enjoining Uber from placing telephone calls in violation of the TCPA;

C. Enjoining Uber from placing telephone calls to residents of New York in violation of G.B.L. § 399-p;

D. Awarding statutory damages under the TCPA in the amount of $500 per violation, and trebling such damages for a total of $1,500 per violation, in total amount of not less than $500,000,000;

E. Awarding statutory damages under G.B.L. § 399-p in the amount of $50 per violation, and increasing such award to $1,000 per violation, in a total amount of not less than $500,000,000;

F. Awarding reasonable costs and fees of this action, including, but not limited to, attorneys' fees pursuant to G.B.L. § 399-p; and

G. Awarding such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands trial by jury of all claims so triable.

Dated: New York, New York
March 11, 2016

            SIMMONS HANLY CONROY

       By: /s/ Andrea Bierstein
         Andrea Bierstein
         abierstein@simmonsfirm.com
         Mitchell Breit
         mbreit@simmonsfirm.com
         SIMMONS HANLY CONROY
         112 Madison Ave., 7th floor
         New York, New York 10016
         Phone: (212) 784-6400

         Martin Fleisher
         MARTIN FLEISHER, J.D, P.C.
         7 Times Square, 27th floor
         New York, New York 10036-6516